THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD NASSER, Defendant-Appellant.
Fourth District   No. 4—91—0389

Opinion filed December 30, 1991.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

After a bench trial, the trial court found defendant, Richard Nasser, guilty of arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1), perjury (Ill. Rev. Stat. 1989, ch. 38, par. 32—2), and violating the secured creditor criminal provisions of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1989, ch. 26, par. 9—306.01(1)(b)) and sentenced him to four years and one month of probation, on the conditions (among others) that he serve six months in jail and pay restitution of approximately $35,000. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt of arson, and (2) the trial court erred in ordering him to pay restitution. We affirm.

## I. FACTS

Defendant and Albert Clark, a passive investor, owned American Termite and Pest Control (American Termite). Defendant served as

president of American Termite while Clark owned and operated a Chevrolet dealership in Cayuga, Indiana. In order to start American Termite, Clark cosigned a $57,000 note in January 1988 for American Termite from the Palmer American National Bank (Palmer Bank). In March 1988, defendant and Clark rolled this note over and added $108,500 to the total loan. Defendant made no payments on this loan, and in May 1988, Clark and defendant borrowed another $10,000 from the Palmer Bank. Defendant used part of the $108,500 to lease three trucks from Clark's Chevrolet dealership for American Termite. He also bought other equipment assets for the business that served as collateral for the bank loans.

After the May 1988 loan, defendant still could not make the loan payments. In June 1988, Clark personally loaned defendant $15,000 to cover the first payments on the loan. The loan payments still went completely unpaid. On August 25, 1988, defendant wrote a check to Clark for the $15,000 loan plus interest; he also wrote another check for $300 for a broken windshield. Both checks bounced.

Before Clark could repossess the trucks, defendant sold one to another Chevrolet dealership. Defendant also sold other assets of the business that served as security for the bank loans.

Amidst this financial turmoil, a fire broke out at American Termite's office building on the morning of September 8, 1988, shortly after 6 a.m. Earlier that same morning, around 5:50 a.m., defendant and Richard Winslow met at American Termite's office to pick up some equipment from a pole barn adjacent to the office building. Defendant was already present when Winslow pulled up to the building. After they loaded the equipment onto a truck, Winslow entered the small office building to get a tissue. Defendant followed him into the building. When Winslow left, sometime between 5:55 to 6 a.m., defendant told Winslow to meet him at a gas station in about 15 minutes. Defendant intended to pick up a friend there. Defendant remained in the building when Winslow left the area and was thus the last person in the building prior to the fire. Defendant and Winslow later met at the gas station around 6:30, when defendant pulled up with another man in his truck.

At approximately 6:14 that same morning, an employee of a neighboring business reported the fire at American Termite after noticing smoke coming out of the American Termite office building. Firefighters arrived at about 6:30 and stopped the blaze at about 7:15, before it could cause serious damage. Michael Hill, a certified fire inspector, testified that he did not find a possible accidental cause for the fire, such as an electrical short or a mislaid cigarette. Hill further

testified that the burn patterns and temperature of the fire, along with the speed at which the fire spread in the short time between defendant's leaving the building (sometime after 6 a.m.) and the report of the fire (6:14), led him to believe that somebody had intentionally started the fire by using an accelerant.

The fire caused only about $10,000 in damage. Defendant had insured the building and its contents for $85,000 with the Travelers Insurance Company. The Travelers immediately paid defendant $1,000 under the policy but made no further payment because of the investigation into the cause of the fire.

In June 1989, a grand jury indicted defendant for 13 counts of perjury, two counts of violating the UCC secured creditor provisions, one count of theft, and two counts of arson. Defendant waived a jury trial. After the State presented its case, the trial court directed verdicts of not guilty on the first two counts of perjury, the theft charge, and the second arson count. At the end of trial, on May 11, 1990, the court entered a written order finding defendant not guilty of all but one of the remaining counts of perjury but guilty of the UCC criminal violations and of one count of arson. The court then sentenced defendant as previously described.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first challenges the sufficiency of the evidence to prove him guilty of arson beyond a reasonable doubt. The following standard of review applies to this argument:

"When presented with a challenge to the sufficiency of the evidence, it is not the function of [a reviewing] court to retry the defendant. *** [Rather,] 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

The evidence shows that defendant was the only person with both a strong motive and a clear opportunity to set the fire. Even Clark, defendant's business partner, had repossessed two of the three trucks defendant leased from Clark. On the morning of the fire, only 15 to 20 minutes elapsed between the time Winslow left defendant at the office and the time neighbors reported the fire there. Finally, the testimony of Hill regarding the pattern of the burns, the temperature at which the fire burned, the speed at which it spread, and that he

could find no accidental cause for the fire support the conclusion that someone intentionally set it.

Defendant argues that we should reverse his conviction because only circumstantial evidence linked him to starting the fire and because others had an opportunity and motive to start it. We are not persuaded. We agree with the following observation from *People v. Dukes* (1986), 146 Ill. App. 3d 790, 794, 497 N.E.2d 351, 354:

> "The opportunity for [committing] an arson, the motive inducing an arson and the identity of a person accused of arson may all be established through circumstantial evidence because the crime of arson is, by its very nature, secretive and usually incapable of direct proof."

Further, guilt beyond a reasonable doubt can be proved by purely circumstantial evidence. (*People v. McKinney* (1990), 193 Ill. App. 3d 1012, 550 N.E.2d 604.) Finally, as the supreme court has noted, "[s]peculation that another person might have committed the offense *** does not necessarily raise reasonable doubt as to the guilt of the accused." *People v. Herrett* (1990), 137 Ill. 2d 195, 206, 561 N.E.2d 1, 6.

Viewing the evidence in the light most favorable to the prosecution, we conclude that it is sufficient to enable the trial court to find defendant guilty of arson beyond a reasonable doubt.

### III. THE ORDER OF RESTITUTION

Defendant next argues that the trial court erroneously ordered him to pay restitution of approximately $35,000 based upon his convictions for arson and the secured creditor violations of the UCC. Citing *People v. Stocke* (1991), 212 Ill. App. 3d 547, 571 N.E.2d 192, and *People v. Sharp* (1989), 185 Ill. App. 3d 340, 541 N.E.2d 689, two decisions of the Fifth District Appellate Court, defendant argues that because neither of the crimes of which he was convicted is a crime of violence, the trial court had no authority to order him to pay restitution. We agree with defendant that both *Stocke* and *Sharp* support defendant's position, but because we believe those cases were wrongly decided, we reject his argument and affirm the trial court's order of restitution.

■ Defendant's argument requires us to construe the word "victim," as used in section 5—5—6(b) of the Unified Code of Corrections (Code), to determine whether that term must be limited to victims of violent crime, thereby barring trial courts from ordering defendants convicted of nonviolent crimes to pay restitution to the victims of those crimes. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6(b).) The

cardinal rule for courts in construing statutes is to ascertain legislative intent and give it effect. (*People v. Scharlau* (1990), 141 Ill. 2d 180, 192, 565 N.E.2d 1319, 1324-25.) Further, "[w]hen construing a statute, a court should additionally consider the purposes to be achieved by the law." *In re Estate of Callahan* (1991), 144 Ill. 2d 32, 43, 578 N.E.2d 985, 989.

In *Sharp*, the Fifth District Appellate Court (hereinafter Fifth District) noted—possibly based on the parties' arguments there—that the definition of "victim" in the Code (Ill. Rev. Stat. 1987, ch. 38, par. 1005—1—22) incorporated the definition of "victim" contained in section 3(a) of the Bill of Rights for Victims and Witnesses of Violent Crime Act (Act) (Ill. Rev. Stat. 1987, ch. 38, par. 1403(a)). (*Sharp*, 185 Ill. App. 3d at 344, 541 N.E.2d at 691.) That latter definition defined "victim" as follows:

> " 'Victim' means (1) a person physically injured in this State as a result of a violent crime perpetrated or attempted against that person or (2) a person who suffers injury to or loss of property as a result of a violent crime perpetrated or attempted against that person or (3) the spouse, parent, child or sibling of a person killed as a result of a violent crime perpetrated against the person killed or the spouse, parent, child or sibling of any person granted rights under this Act who is physically or mentally incapable of exercising such rights, except where the spouse, parent, child or sibling is also the defendant or prisoner or (4) any person against whom a violent crime has been committed or (5) any person who has suffered personal injury as a result of a violation of Section 11—501 of The Illinois Vehicle Code, or of a similar provision of a local ordinance, or of Section 9—3 of the Criminal Code of 1961, as amended." Ill. Rev. Stat. 1987, ch. 38, par. 1403(a).

The *Sharp* court seemed to apply this definition of "victim" as if it were limited to victims of violent crimes. The court also implied that because this definition applied throughout the Code, including the provisions on restitution, the trial court could order restitution only where the defendant committed a violent crime. (*Sharp*, 185 Ill. App. 3d at 344, 541 N.E.2d at 691.) Because *Sharp* involved a violent crime, the Fifth District affirmed the trial court's decision that restitution could be ordered.

In *Stocke*, the Fifth District vacated the trial court's order of restitution because the defendant in that case did not commit a violent crime. Instead, the defendant was convicted of driving too fast for conditions. The vehicle defendant was driving collided with another

vehicle, and several occupants of the other vehicle were seriously injured as a result. (*Stocke*, 212 Ill. App. 3d at 549, 571 N.E.2d at 193.) The trial court found defendant guilty and sentenced him, in part, to pay cash restitution in the amount of $95,309 to the occupants of the other vehicle whom he had seriously injured. The amount of restitution was to be reduced by the amount paid by insurance or other payments to the victims of the accident. (*Stocke*, 212 Ill. App. 3d at 550, 571 N.E.2d at 193.) Defendant appealed the order of restitution, and the court wrote the following:

"Section 5—5—6(b) provides that cash restitution may be paid only for actual out-of-pocket expenses, losses, damages and injuries, and only to 'victims' or insurance companies who have indemnified 'victims.' (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6(b).) In *People v. Sharp* (1989), 185 Ill. App. 3d 340, 344, 541 N.E.2d 689, 691, we held that the term 'victim' as used in the restitution statute means any person physically injured in this State as a result of a violent crime perpetrated or attempted against that person. We further held that the term 'violent crime' means any felony in which force or threat of force was used against the victim or any misdemeanor which results in death or great bodily harm to the victim ***.

The offense for which defendant was convicted in the instant case was a petty offense. As such, it clearly does not fall within the definition of 'violent crime,' and the parties to whom defendant was ordered to make restitution do not qualify as 'victims' within the meaning of the restitution statute. Accordingly, the trial court erred in ordering defendant to make restitution in cash to those parties." *Stocke*, 212 Ill. App. 3d at 553-54, 571 N.E.2d at 195-96.

In *People v. Strebin* (1991), 209 Ill. App. 3d 1078, 1084, 568 N.E.2d 420, 423, this court also construed section 5—5—6(b) of the Code and noted that the provisions in that subsection were added to the restitution statute by Public Act 83—1061 (Pub. Act 83—1061, eff. July 1, 1984 (1983 Ill. Laws 7226, 7227)). The language added to that section by Public Act 83—1061 reads as follows:

" '(b) In fixing the amount of restitution to be paid in cash, the court shall allow credit for property returned in kind, for property damages ordered to be repaired by the defendant, and for property ordered to be restored by the defendant; and after granting such credit, the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and such other victims who may

also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant, and insurance carriers who have indemnified the named victim or other victims for such out-of-pocket expenses, losses, damages, or injuries, provided that in no event shall restitution be ordered to be paid on account of pain and suffering.' (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—6(b).)" (*Strebin*, 209 Ill. App. 3d at 1084, 568 N.E.2d at 423-24.)

In *Strebin*, we construed the above subsection as follows:

"The [pertinent] language of section 5—5—6(b) of the Code has not been changed since 1984 ***. We view Public Act 83—1061 (Pub. Act 83—1061, eff. July 1, 1984 (1983 Ill. Laws 7226)) as a comprehensive change in the law governing restitution, reflective of an intention by the Illinois General Assembly, in every criminal case where possible, to achieve two goals: (1) to make victims whole for *any* injury received at the hands of the criminal to be sentenced; and (2) to make criminals pay *all* of the costs which arise as a result of injuries the victims suffered." (Emphasis in original.) *Strebin*, 209 Ill. App. 3d at 1084, 568 N.E.2d at 424.

Public Act 83—1499—which added section 5—1—22 to the Code, incorporating by reference section 3 of the Act (quoted earlier)—and Public Act 83—1061, discussed by this court in *Strebin*, were both enacted by the same session of the Illinois General Assembly. (See Pub. Act 83—1061, eff. July 1, 1984 (1983 Ill. Laws 7226); Pub. Act 83—1499, eff. Dec. 27, 1984 (1984 Ill. Laws 3942).) We mention this point because, according to the positions taken by the Fifth District Appellate Court in *Stocke* and *Sharp*, a trial court may order restitution only in cases in which the defendant has been convicted of a violent crime as that term is defined in the Act. Thus, the Fifth District views the definition of "victim" in the Act as a term that *limits* the trial court's authority to order restitution. This interpretation necessarily means that prior to the enactment of the Act in 1984, this limitation upon the trial court's authority was not present in section 5—5—6(b) of the Code, or (for that matter) anywhere else in the Code. Therefore, according to the Fifth District, a trial court sentencing a defendant in 1983 for his conviction of nonviolent crimes, such as theft (Ill. Rev. Stat. 1983, ch. 38, par. 16—1), forgery (Ill. Rev. Stat. 1983, ch. 38, par. 17—3), burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—1), deceptive practices (Ill. Rev. Stat. 1983, ch. 38, par. 17—1), or the like, could order that defendant to pay restitution to the victims of his crimes (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—6(b)), but after

1984, the trial court has been statutorily barred from doing so. Furthermore, under this interpretation, trial courts are barred from ordering restitution no matter how great the resources of the convicted (nonviolent) criminal may be (including stolen funds the location of which is known only to the criminal) and how bereft of funds the victim may have been rendered by the defendant's criminal behavior. But see *People v. Lambert* (1990), 195 Ill. App. 3d 314, 332-34, 552 N.E.2d 300, 312-13 (discussing factors which a trial court *may* consider in ordering restitution).

With all due respect to our colleagues in the Fifth District Appellate Court, we disagree with their interpretation of legislative intent regarding the subject of restitution. The construction on the law of restitution given by the Fifth District simply cannot be what the legislature intended.

As further support for our position that the term "victim" in section 5—5—6(b) of the Code cannot be limited to victims of violent crimes for purposes of restitution, we note that the legislature has added subsection (g) to section 5—5—6 of the Code by Public Act 85—1194 (Pub. Act 85—1194, eff. Aug. 19, 1988 (1988 Ill. Laws 1495, 1505—06)). That subsection reads in pertinent part as follows:

> "The court *shall*, after determining that the defendant has the ability to pay, require the defendant to pay for the victim's counseling services if:
>
> (1) the defendant was convicted of an offense under Sections 11—19.2, 11—20.1, 12—13, 12—14, 12—15 or 12—16 of the Criminal Code of 1961 ***." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6(g)(1).)

New subsection (g), which was enacted prior to the criminal conduct in the present case leading to defendant's conviction, twice uses the term "victim," yet the offenses specified, for which restitution is *mandatory*, are not in all instances crimes of violence as the Act defines that term. Most of the offenses listed in subsection (g) are sex offenses which involve sexually abusing children without using any force or threat of force.

In *People v. Gaytan* (1989), 186 Ill. App. 3d 919, 542 N.E.2d 1163, the Second District Appellate Court confronted a similar argument that because the defendant was convicted of various drug offenses, the trial court erred in ordering him to pay restitution because his conviction was not for a crime of violence. The court in response wrote the following:

> "The focus of section 5—5—6 of the Code of Corrections under which restitution may be ordered to a victim is on the crim-

inal acts the defendant is convicted of, such as where property was taken, property damage incurred, or personal injury suffered. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—6(a), (b).) The victim of such crimes is entitled to restitution in the court's discretion. Rather than looking solely at the definition of 'victim' in section 5—1—22, which adopts the meaning of 'victim' in section 3 of the Victim's Bill of Rights Act and is limited to victims of violent crimes only, we believe section 5—5—6 applies more broadly to victims other than from violent crimes, and, accordingly, we further look to whether property was taken, property damage was incurred, or personal injury sustained." *Gaytan*, 186 Ill. App. 3d at 929, 542 N.E.2d at 1170-71.

We find *Gaytan* to be consistent with the views we thereafter expressed in *Strebin*. We adhere to those views and reject defendant's argument that the trial court may impose an order of restitution only when the defendant has been convicted of a violent crime. To hold otherwise would bar the trial court from ordering restitution in cases like *People v. Powell* (1990), 199 Ill. App. 3d 291, 295, 556 N.E.2d 896, 899, in which this court affirmed an order of restitution of $5,710 entered against a defendant convicted of State benefits fraud.

In contrast to the goals of restitution we discussed in *Strebin*, the Fifth District Appellate Court in *Sharp* wrote the following:

"The general purpose of the Code of Corrections is to rehabilitate the offender, if possible, and to restore him to useful citizenship. (Ill. Rev. Stat. 1987, ch. 38, par. 1001—1—2; *People v. Mahle* (1974), 57 Ill. 2d 279, 312 N.E.2d 267.) We are concerned that in the instant case, the probation system is not being used for rehabilitative purposes, but comes close to imposing civil liability. In interpreting California's restitution statute, the California Supreme Court stated:

'Disposing of civil liability cannot be a function of restitution in a criminal case. To begin with, the criminal justice system is essentially incapable of determining that a defendant is in fact civilly liable, and if so, to what extent. *** A party sued civilly has important due process rights, including appropriate pleadings, discovery, and a right to a trial by jury on the specific issues of liability and damages. The judge in the criminal trial should not be permitted to emasculate those rights by simply declaring his belief that the defendant owes a sum of money.' *People v. Richards* (1976),

17 Cal. 3d 614, 620, 552 P.2d 97, 101, 131 Cal. Rptr. 537, 541."

*Sharp*, 185 Ill. App. 3d at 347, 541 N.E.2d at 693.

We quote the above language to emphasize our disagreement with it. As we stated in *Strebin*, the Illinois General Assembly intended, in every criminal case where possible, to achieve two goals: (1) to make victims whole for *any* injury received at the hands of the convicted criminal; and (2) to make criminals pay *all* of the costs which arise as a result of injuries the victim suffered. (*Strebin*, 209 Ill. App. 3d at 1084, 568 N.E.2d at 424.) We do not share the views of the Fifth District Appellate Court in *Sharp*, wherein that court expresses concern for the *civil* due process rights of convicted criminals when trial courts assess orders of restitution.

First, by any standard, the hoops the State must jump through before convicting a criminal defendant—the criminal due process rules—provide more protection to criminal defendants than the civil due process rules provide civil defendants when determining whether a civil defendant is liable to a plaintiff.

Second, as opposed to typical civil litigation, there is no moral equivalence between the two parties before the court. The criminal, through his own volition, committed the criminal act which caused the damage suffered by the crime victim for which restitution is to be ordered.

A criminal defendant becomes subject to an order of restitution only after he has been convicted. We acknowledge that the niceties of civil litigation (as discussed in the *Richards* case from California), such as discovery and the right to a jury determination of both liability and damages, are not provided to a criminal defendant at his sentencing hearing when the trial court decides what order of restitution to impose upon him. However, we regard the loss of these civil rights as part of the costs of being a convicted criminal. We note that the Code is filled with provisions whereby convicted criminals lose one or more of their civil rights: section 5—8—1 (imprisonment) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1); section 5—7—1 (periodic imprisonment) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—7—1); and section 5—6—3 (probation and conditional discharge, providing for 24 separate conditions that the court can impose, such as a fine, restitution, public service work, home confinement, *et cetera*) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—6—3). Indeed, the loss of the due process rights provided to defendants in civil cases is one of the less significant losses that convicted criminals suffer.

We emphasize that the trial court should satisfy itself of the legitimacy of any claim for restitution, as well as the amount of the claim. Normally, the information provided to the court by the probation office in the presentence report should suffice. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—3—2(a)(3); see also *Powell*, 199 Ill. App. 3d at 294, 556 N.E.2d at 898.) However, if that information is disputed by some specific claim of inaccuracy (*Powell*, 199 Ill. App. 3d at 295, 556 N.E.2d at 899), then the trial court should conduct such further proceedings as it deems necessary to obtain trustworthy and reliable information upon which to base its order of restitution.

Consistent with the views we expressed in *Strebin*, we believe trial courts have a duty, to the extent possible, to order restitution to benefit victims so that they can avoid the bother, expense, and delay too often present in the civil justice system. This duty is mandated by the legislative intent underlying section 5—5—6 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—6). The focus of concern for the courts ought to be that victims of crime, who have been forced to endure the suffering, inconvenience, and hardship frequently associated with that status, receive remuneration for the damages they have suffered. (See *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board* (1991), 502 U.S. ____, ____, 116 L. Ed. 2d 476, 488-89, 112 S. Ct. 501, 509 ("There can be little doubt *** that the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them").) Courts should be more concerned with the need to make whole the victims of crime rather than with the *civil* interests of convicted criminals.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.